# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Delvin Lamont Shaw, | ) |
| Plaintiff, | ) Case No. 2:15-cv-102 |
| vs. | ) **REPORT AND RECOMMENDATION** |
| Shannon Shell, Correctional Officer at Grand Forks County Correctional Center (in his individual capacity), | ) |
| Defendant. | ) |

Plaintiff Delvin Lamont Shaw (Shaw) filed a pro se complaint under 42 U.S.C. § 1983; the only remaining claim alleges that defendant Shannon Shell (Shell) used excessive force in tasing Shaw at the Grand Forks County Correctional Center (GFCCC). (Doc. #5; see also Doc. #12). Shell moves for summary judgment, asserting that there are no questions of material fact as to the use of force or as to Shell's entitlement to qualified immunity. (Doc. #24). Shaw opposes the motion. (Docs. #28, 29, 30).

## Summary

Shaw has not set forth sufficient facts showing a genuine dispute of any material fact as to his claim that Shell used excessive force, and Shell is thus entitled to qualified immunity. Therefore, this court recommends that Shell's motion for summary judgment be granted, that the personal capacity excessive force claim against Shell be dismissed with prejudice, that the complaint be dismissed in its entirety, and that judgment be entered accordingly.

## Facts

As defendants, Shaw's initial complaint named GFCCC and Shell, in both his personal and official capacities. (Doc. #5, p. 3). The initial complaint alleged only the

following: "I have a scar on my neck [and] . . . stomach from Officer Shell['s] taser gun. . . . I pulled muscles in my neck while being tased by Officer Shell. . . . [My] muscles are jumping all over now, and [my] heart rate [is] much faster." (Doc. #5, p. 4) (capitalization, punctuation, and spelling altered throughout).

Pursuant to 28 U.S.C. § 1915A, the court conducted an initial review of Shaw's complaint and filed a report and recommendation. (Doc. #11). Noting that pleadings filed by pro se litigants must be liberally construed and are held to less stringent standards than are pleadings drafted by attorneys, Erickson v. Pardus, 551 U.S. 89, 94 (2007), the court construed Shaw's pleadings as asserting claims for use of excessive force, (Doc. #11, p. 3). Because a county jail is not an entity that can be sued under § 1983, the court recommended that the claims against GFCCC be dismissed with prejudice. (Doc. #11, p. 3). As to the claims against Shell, the court recommended that the official capacity claims be dismissed without prejudice because Shaw failed to allege that any county policy, custom, or practice caused his alleged constitutional deprivation. Id. The court also recommended that the personal capacity claims against Shell be dismissed without prejudice as the complaint did not contain enough facts to allow the court to reasonably infer that Shell was liable for the alleged misconduct. Id. at 4-5.

Shaw then filed an objection, in which he alleged that, on July 5, 2015, "Shell shot me with 50,000 volts over and over on video. I showed no threat to officers nor inmates." (Doc. #12, p. 1). He added, "Shell didn't say anything about a taser before shooting me[;] he also shot me from the hallway when I was walking to my cell." Id.

Considering Shaw's objection as a supplement to the complaint, the court withdrew its prior report and recommendation and entered an amended report and

2

recommendation. (Doc. #13). The court maintained its recommendations that the claims against GFCCC and Shell in his official capacity be dismissed. Id. at 4. However, liberally construing Shaw's pro se pleadings, the court concluded that Shaw's pleadings had sufficiently alleged that Shell's actions were objectively unreasonable. Id. at 6. The court therefore recommended that the personal capacity excessive force claim against Shell proceed. Id. The district judge adopted the amended report and recommendation, dismissing all but the personal capacity claim against Shell. (Doc. #14).

Shell now moves for summary judgment, asserting that he is entitled to qualified immunity. (Doc. #24). In his brief in support of his summary judgment motion, Shell alleges additional "uncontested" facts. (Doc. #25, p. 2). Among the documents filed in support of his motion for summary judgment are an affidavit of Shell, a portion of GFCCC's standard operating procedures manual relating to taser usage, incident reports completed by GFCCC correctional officers, Shaw's incident report to the Grand Forks County Sheriff's Department, and a video of the July 5, 2015 incident. (Docs. #26, 26-3, 26-4, 26-5, 27).

The court will summarize the events depicted in the video of the July 5, 2015 incident, noting the video does not contain audio. (Doc. #27) (physical copy of video on file with the Clerk of Court). The video begins with a view of a community area that is empty except for two tables with chairs, a broom leaning against a wall by a door, a dust pan, and a garbage can. Id. at 0:00-0:02. Shaw then enters, briefly walks through the area, and looks out of a door window. Id. at 0:02-0:33. He then picks up the broom and begins striking a ceiling-mounted sprinkler head. Id. at 0:34-1:12. Shaw strikes the sprinkler head over forty times; he begins with his back facing the door, but, before the

3

last few strikes, he turns to face the door. Id. The door to the area is opened, and arms holding a taser can be seen. Id. at 1:12. The taser is deployed, and Shaw collapses to the floor on his back. Id. at 1:12-1:17. Shaw is no longer holding the broom, but it remains within his reach. Id. Shell then steps into the common area, standing by the door until other officers arrive. Id. at 1:47-1:50. Two other officers enter the area and remove the broom from Shaw's reach. Id. at 1:50. Another officer enters the area. Id. at 1:58. While Shell remains standing by the door, the other three officers handcuff Shaw and remove the taser probes. Id. at 1:58-4:20. The other three officers assist Shaw in rising from the ground, and the video ends. Id. at 5:40-5:43.

The court will next summarize the facts as stated by Shell in his affidavit and in his memorandum supporting his summary judgment motion. Shaw was incarcerated at GFCCC following his June 22, 2015 convictions for murder and burglary. (Doc. #26, p. 1) On July 5, 2015, Shaw was "observed repeatedly striking a ceiling mounted sprinkler head in the Unit 2A day room with a broomstick." Id. GFCCC staff used an intercom to order Shaw to stop striking the sprinkler head and to "lock down." Id. at 2. Shaw did not comply with the lock down directive but continued to strike the sprinkler head with a broom, which "constituted a weapon which could be used to inflict property damage, serious bodily harm, or death." Id.

GFCCC staff then intervened; while another correctional officer opened the door to the area where Shaw was located, Shell—with a taser in his hand—told Shaw that he would be tased if he did not stop striking the sprinkler head. Id. Because Shaw again disregarded the orders, Shell "activated the taser one time in probe mode[,] striking [Shaw] in the torso." Id. Shaw fell to the ground and dropped the broom, though it

4

remained within his reach. Id. Other officers came to assist Shell, the broom was removed from Shaw's reach, Shaw was handcuffed, and the taser probes were removed from his torso. Id. GFCCC staff asked Shaw if he needed medical attention, but he declined. Id. at 3. Shaw then verbally threatened Shell while being escorted to a holding cell. Id. at 2-3. Shaw also declined a second offer of medical treatment. Id. at 3.

Shaw received citations for rule violations, and an internal hearing was conducted, during which he "admitted to trying to break the sprinkler head in the dayroom of Unit 2A and to disregarding orders to lock down." (Doc. #25, p. 4) During the hearing, Shaw stated he was upset with Shell and wanted Shell "to do extra work." Id. Shaw also admitted to "refusing to listen to . . . Shell's orders to put the broom down and lock down." Id.

In response to the summary judgment motion, Shaw filed three documents, each containing only one paragraph. (Docs. #28, 29, 30). Shaw did not provide any sworn evidence, and he did not challenge the majority of facts alleged in Shell's affidavit. Shaw states that Shell "violated state and federal laws." (Doc. #28, p. 1) (capitalization, punctuation, and spelling altered throughout). Shaw claims that, on the date of the incident, he posed "no threat" and that Shell "called me back from my cell to shoot me with a 15,000 volt taser gun in my neck. Shell committed a felony act and should be charged for his actions." Id. Shaw further claims that the video of the incident "has been altered because I remember my back was facing the door when it opened, and I turned around a second before being shot by . . . Shell." (Doc. #29, p. 1; see also Doc. #30, p. 1). He requests that an "expert . . . do a full examination of [the] exhibit" since "video can be altered just by a push of a button." (Doc. #29, p. 1). Shaw asserts that "altering this

5

video violates . . . federal criminal code and rules. I [would] like to press charges also on this criminal matter." Id.; (see also Doc. #30, p. 1).

## Summary Judgment Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the burden of establishing the basis for its motion. Donovan v. Harrah's Md. Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002). When the moving party demonstrates that no material facts are in dispute, the nonmoving party then bears the burden of setting forth facts showing a genuine issue for trial. Id. While the court must view all facts and inferences in the light most favorable to the nonmoving party, id., "[f]actual disputes that are irrelevant or unnecessary will not be counted," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is appropriate if no reasonable jury could return a verdict for the nonmoving party. Id.

## Discussion

Shell asserts that he is entitled to qualified immunity regarding the personal capacity excessive force claim against him. Qualified immunity shields a government official from liability unless (1) the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the conduct at issue. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)). Courts have discretion in deciding which prong of the

qualified immunity analysis to address first and need not address the remaining prong if the first is decided in the defendant's favor. Id. (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)). In deciding Shell's summary judgment motion, the court should first consider whether there are genuine disputes of material fact as to the alleged constitutional violation—Shaw's claim that Shell used excessive force.

Shaw was convicted of murder and burglary on June 22, 2015.[1] (Doc. #26-1, pp. 1-2). Therefore, Shaw was a convicted prisoner[2] on July 5, 2015—the date that he was tased. When a convicted prisoner asserts claims of excessive force, the Eighth Amendment's ban on cruel and unusual punishments applies, prohibiting the unnecessary and wanton infliction of pain. Whitley v. Albers, 475 U.S. 312, 319 (1986).

"Where a prison security measure is undertaken to resolve a disturbance . . . that indisputably poses significant risks to the safety of inmates and prison staff," the court must consider whether force was used in a good faith effort to maintain or restore discipline or whether force was used maliciously and sadistically to cause harm. Id. The Supreme Court has stated that prison officials "'should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment

---

[1] While not impacting the instant case, the court notes that Shaw appealed from the criminal judgment, and the North Dakota Supreme Court reversed and remanded for a new trial. See State v. Shaw, 883 N.W.2d 889 (N.D. 2016). Following the second trial—held in February 2017—a jury again found Shaw guilty of the charges, and the state district court entered judgment on March 3, 2017. See North Dakota Courts Records Inquiry, http://publicsearch.ndcourts.gov/default.aspx (last visited Mar. 7, 2016).

[2] On initial review, this court stated—based on the limited information available at the time—that it appeared Shaw was a pretrial detainee during the time in question. (Doc. #13, p. 5). However, additional information has since been filed, and the court is now able to determine that Shaw was a convicted prisoner on the date of the incident.

are needed to preserve internal order and discipline and to maintain institutional security.'" Hudson v. McMillian, 506 U.S. 1, 6 (1992) (quoting Whitley, 475 U.S. at 321-22). Moreover, the Supreme Court has recognized that prison officials "must make their decisions 'in haste, under pressure, and frequently without the luxury of a second chance.'" Id. (quoting Whitley, 475 U.S. at 320). Courts have consistently determined that applications of force are constitutionally permissible when prison security and order or the safety of other inmates or officers are placed in jeopardy. E.g., Whitley, 475 U.S. at 326 (riot and hostage situation); Stenzel v. Ellis, 916 F.2d 423, 426-28 (8th Cir. 1990) (refusal to comply with security regulations).

In Hickey v. Reeder, the Eighth Circuit considered whether the use of a taser on a prisoner violated the prisoner's Eighth Amendment rights. 12 F.3d 754 (8th Cir. 1993). There, prison officials ordered Hickey—who was locked in his cell—to sweep his cell, but Hickey refused. Id. at 756. Although Hickey used profanity and "wav[ed] his hands as he spoke," he did not have a weapon and did not threaten to physically assault an officer or other inmate. Id. at 756-57. After officers entered his cell to persuade him to sweep and to warn him about the consequences of not sweeping his cell, Hickey continued to refuse to comply with the order. Id. at 756. An officer then shot Hickey with a "stun gun." Id. When the stun gun was deployed, six or seven officers were "in and around Hickey's cell, but the officers did not take advantage of Hickey's incapacitation to neutralize any perceived threat to their safety. At no time did they attempt to remove, isolate, or restrain Hickey." Id. at 757. Upon recovering from the shock, Hickey swept his cell, though he "continued carrying on, cursing, and threatening to sue the officers until the last officer left." Id. at 756. Determining that Hickey's Eighth Amendment rights had

8

been violated, the Eighth Circuit stated "that there was no need for physical force to compel Hickey to sweep his cell" because he did not physically threaten the officers—the stun gun was used merely to enforce an order to sweep, not to protect officers or other inmates. Id. at 758.

More recently, in Burns v. Eaton, the Eighth Circuit addressed use of force against a prisoner who refused to comply with instructions to submit to being handcuffed. 752 F.3d 1136 (8th Cir. 2014). In that case, prisoner Burns was taken to a locked shower cell to wash off a topical medication used to treat scabies. Id. at 1138. When Burns finished showering, an officer instructed him to turn around to be handcuffed. Id. After Burns refused the initial and repeated instructions, the officer warned Burns that he would be pepper-sprayed if he failed to comply. Id. Burns continued to ignore the directive, threw a shampoo bottle and soap dish at the officer, and spit at the officer; Burns was eventually restrained after the officer deployed pepper spray. Id. The court rejected Burns' argument that "he posed no threat because he was alone in a locked cell" because that contention "ignore[d] the reality of what was required to maintain or restore discipline in th[e] situation." Id. at 1139 (internal quotation marks omitted). The court noted that, at the time of the incident, the officer was faced with "a recalcitrant inmate" who could not be left in the area. Id. The court further stated that, "[a]fter each aggressive act of defiance, [the officer] deployed a small amount of pepper spray. This is not a case where 'a complete absence of a penological purpose' raised 'the reasonable inference that the officers acted maliciously in an effort to cause harm.'" Id. at 1140 (quoting Williams v. Jackson, 600 F.3d 1007, 1014 (8th Cir. 2010)).

9

Shaw's case is distinguishable from Hickey. Hickey did not have a weapon, did not pose a physical threat to officers or other inmates, and refused to comply with an order concerning cleaning (rather than a safety-related order); Shaw, on the other hand, was in possession of a broom at the time in question—which Shell notes constituted a weapon and which Shaw used to repeatedly strike a sprinkler head, despite being ordered to stop. (Doc. #26, pp. 1-3) (affidavit of Shell); (Doc. #26-4, pp. 1-3) (incident reports by Officers Benke, Shell, Jaeche, and Stechmann). Further, at a disciplinary hearing on the matter, Shaw admitted to trying to break the sprinkler head and to refusing to follow orders to put down the broom and to "lock down." (Doc. #26-4, p. 4) (record of disciplinary hearing).

Shaw's case is therefore analogous to Burns in that Shaw continued to refuse to comply with an officer's orders regarding jail security or the safety of others. Although Shaw claims he was "walking to [his] cell" when he was tased, (Doc. #12, p. 1), the video clearly shows he was instead persisting in attempting to damage jail property by striking a sprinkler head with a broom, which could be used as a weapon. Damage to the sprinkler head presented a danger to the safety of other inmates and GFCCC staff, since it could have impacted proper functioning of the sprinkler system. Like Burns, this is not a case where a complete absence of a penological purpose raised the reasonable inference that Shell acted maliciously in an effort to cause harm. Rather, the video shows that Shell deployed his taser only once—not "over and over" as Shaw alleges, id.—to incapacitate Shaw long enough for other officers to assist and safely approach and restrain Shaw. Neither Shell nor other officers applied additional force after Shaw was subdued, and Shaw declined two offers of medical attention.

This court notes that, although it must view the facts in the light most favorable to the non-moving party, the court is not required to "accept unreasonable inferences or sheer speculation as fact." Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004). Nor is the court required to accept as true the non-moving party's factual allegations when those allegations are clearly refuted by other evidence. Shaw may not "simply point to allegations made in [his] complaint but must identify and provide evidence of 'specific facts creating a triable controversy.'" Id. (quoting Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999)).

Shaw has offered no evidence—only his bare allegations—to counter the facts and evidence provided by Shell. This court has carefully reviewed that evidence, including video footage of the incident. While Shaw asserts that the video has been altered, that assertion is supported merely by his unsworn statement that he was facing another direction at the time he was tased and that "video can be altered just by a push of a button." (Doc. #29). Shaw offers no evidence supporting his theory of video alteration, and this court's review of the video substantiates no indication of alteration. To the extent that Shaw disputes Shell's statement of the "uncontested facts" regarding the incident, the video refutes those disputes. Shaw has thus not set forth facts showing a genuine issue regarding video alteration.

The video also belies Shaw's statement that Shell "called [Shaw] back from [his] cell to shoot [him]," (Doc. #28, p. 1). Moreover, apart from claiming he was facing a different direction when he was tased, Shaw does not state that the remainder of events differed from those depicted in the video. Furthermore, regardless of which way Shaw was facing at the time he was tased, he continued to ignore officers' orders and

11

remained in possession of an item that could be used as a weapon. As in Burns, the district court should reject Shaw's assertion that he posed no threat to others because that assertion "ignores the reality of what was required to maintain or restore discipline in this situation." 752 F.3d at 1139 (internal quotation marks omitted).

This court also addresses Shaw's requests that Shell be criminally charged as to the tasing incident and the alleged video alteration. (Docs. #28, 29, 30). A private citizen does not have a constitutional right or any other basis to compel a criminal investigation or prosecution. Mitchell v. McNeil, 487 F.3d 374, 378 (6th Cir. 2007) ("There is no statutory or common law right, much less a constitutional right, to an investigation."); see also Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). Additionally, Shaw did not raise these claims in his pleadings, and they are not properly raised in his summary judgment responses. Even if the claims had been properly raised, they would be futile since Shaw has no right to compel a criminal investigation or prosectuion. To the extent Shaw seeks leave to amend his complaint to assert such claims, that request should be denied.

In summary, the district court should conclude that Shell did not use force maliciously and sadistically to cause harm, but rather in a good faith effort to maintain or restore discipline. Thus, he did not violate Shaw's right to be free of excessive force. Because Shell did not violate Shaw's constitutional rights, it is not necessary to analyze the second prong of the qualified immunity analysis, and the district court should determine that Shell is entitled to qualified immunity. See Pearson, 555 U.S. at 232 ("Qualified immunity is applicable unless the official's conduct violated a clearly

established constitutional right."). This court recommends that Shell's summary judgment motion be granted and the excessive force claim against Shell be dismissed with prejudice.

## Conclusion

For the reasons discussed above, this court **RECOMMENDS** that Shell's motion for motion for summary judgment be **GRANTED**, that the personal capacity excessive force claim against Shell be **DISMISSED** with prejudice, that the complaint be **DISMISSED** in its entirety, and that judgment be entered accordingly. This court further **RECOMMENDS** that the district court certify that any appeal would be frivolous, could not be taken in good faith, and may not be taken in forma pauperis.

Dated this 10th day of March, 2017.

*/s/ Alice R. Senechal*
Alice R. Senechal
United States Magistrate Judge

## NOTICE OF RIGHT TO OBJECT[3]

Any party may object to this Report and Recommendation by filing with the Clerk of Court no later than **March 24, 2017**, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Any responses to objections are due by **April 7, 2017**. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.

---

[3] See Fed. R. Civ. P. 72(b); D.N.D. Civ. L.R. 72.1.